**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 10 C 3168** |
| **v.** | ) | |
| | ) | **Magistrate Judge Morton Denlow** |
| **ASIA PACIFIC TELECOM, INC.,** | ) | |
| **d/b/a ASIA PACIFIC NETWORKS,** | ) | |
| **REPO B.V.,** | ) | |
| **SBN PERIPHERALS, INC., d/b/a** | ) | |
| **SBN DIALS,** | ) | |
| **JOHAN HENDRIK SMIT** | ) | |
| **DUYZENTKUNST, and** | ) | |
| **JANNEKE BAKKER-SMIT** | ) | |
| **DUYZENTKUNST,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Plaintiff's motion for sanctions and for a rule to show cause why Defendants should not be held in contempt of court. Plaintiff Federal Trade Commission ("FTC") alleges that Defendant Johan Hendrik Smit Duyzentkunst ("Smit") deactivated an e-mail account containing communications relevant to this case, after receiving notice of the lawsuit and in violation of a temporary restraining order. Smit denies deactivating the account or having knowledge of who did. The FTC requests that this Court sanction Smit, as well as Defendants Janneke Bakker-Smit Duyzentkunst ("Bakker-Smit"), Repo B.V. ("Repo"), and SBN Peripherals, Inc. ("SBN"). Defendant Asia Pacific Telecom, Inc. ("Asia Pacific"), has not appeared in this case and is not a party to this motion.

The Court held a one-day evidentiary hearing on April 21, 2011, with closing arguments following on April 28. At the hearing, the parties offered witness testimony and introduced depositions and exhibits into evidence. The FTC called three witnesses. Douglas McKenney testified about his role as an FTC investigator in this case. Brick Kane testified about his role with the court-appointed Temporary Equity Receiver. Finally, Smit testified as an adverse witness. Defendants also called Smit to testify in support of their opposition to this motion. The Court has carefully considered the testimony of the three witnesses who testified in person, the various exhibits admitted into evidence, and the closing arguments of counsel.

For the reasons explained below, the Court grants Plaintiff's motion in part and denies it in part. The Court grants the motion for sanctions and contempt against Defendants Smit and SBN, holds them in contempt of court, and sanctions them with an adverse finding. The Court denies the motion for sanctions and contempt against Repo and Bakker-Smit.

The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings.

# I. FINDINGS OF FACT[1]

## A. Parties

1. Asia-Pacific is alleged by the FTC to be a foreign corporation which holds itself out as having its principal places of business in Kowloon, Hong Kong; Almere, Netherlands; and the Northern Mariana Islands. The other Defendants have denied having knowledge sufficient to admit or deny this allegation. Ans. ¶ 6.[2]

2. Repo is a Dutch "limited company," with its principal offices in The Netherlands. Ans. ¶ 7.

3. SBN is a California corporation, with its principal offices in Agoura Hills, California. Ans. ¶ 8.

4. Smit resides in California. He is the director and sole officer and shareholder of SBN and a director of Repo. He has denied being an officer, director, or owner of Asia Pacific, or participating in any activities on behalf of Asia Pacific. Ans. ¶ 9.

5. Bakker-Smit also resides in California and serves as a director of Repo. Ans. ¶ 10.

6. Smit and Bakker-Smit are married and reside together at a house with the same address as SBN's principal offices in Agoura Hills, California. T. 122–23.

---

[1] The Court makes all factual findings in this opinion by clear and convincing evidence.

[2] "Ans." refers to the answer to the FTC's complaint provided by all Defendants except Asia Pacific, Dkt. 58.

## B.    Procedural History

7.      The FTC filed this suit on May 24, 2010.  The case involves Defendants' use of "robocalling" technology to facilitate high-volume, pre-recorded telemarketing calls that, among other things, allegedly contacted consumers on the National Do Not Call Registry and contained deceptive content.  Compl. ¶¶ 13–28, Dkt. 1.  Smit and SBN admit owning and running an "autodialer" capable of making automated telephone calls.  T. 90–91.  As explained by Smit, the autodialer at issue was a piece of technology consisting of hardware, software, connectivity to telecommunications carriers, and a web interface that allowed access to the system.  T. 91.  The FTC alleges that Defendants "caused tens of millions of consumers to receive deceptive and abusive telemarketing solicitations" through robocalling campaigns.  Compl. ¶ 15.

8.      District Judge William T. Hart entered an *ex parte* temporary restraining order (the "TRO") against all Defendants on May 25, 2010.  PX 19.[3]  Robb Evans and Associates LLC (the "Receiver") was appointed as Temporary Equity Receiver and ordered to assume full control over Asia Pacific, Repo, and SBN.  *Id.* at 4, 15–19. The TRO prohibited all Defendants, as well as their officers and other agents, from destroying or erasing documents "that relate in any way to the business practices or business" of Defendants.  *Id.* at 14.  The TRO also ordered them to cooperate with the

_____

[3] "PX" refers to exhibits tendered by the FTC at the evidentiary hearing.  Marked attachments to exhibits are indicated by a hyphen.  For example, Attachment 2 to the FTC's Exhibit 4 is denoted as "PX 4-2."  Unmarked attachments are designated as "Attach. to" the corresponding exhibit.

Receiver by, among other things, "[p]roviding any information to the Receiver that the Receiver deems necessary" to discharging its responsibilities. *Id.* at 19.

9.    The FTC served Smit, and through him SBN, Repo, and Bakker-Smit, with the complaint and TRO on June 2, 2010 at Smit's residence in Agoura Hills, California. Summons, Dkt. 25–28; T. 82, 121–22.

10.    All parties consented to magistrate judge jurisdiction on February 3, 2011. Joint Consent, Dkt. 115; Order of the Executive Committee, Dkt. 117.

**C.    Origin and Use of the Dalong Chin E-mail Account**

11.    Erick Van der Maas, a long-time acquaintance of Smit, resides in Saipan, Northern Mariana Islands. Van der Maas Decl. ¶¶ 1, 3, PX 4-1.[4] He is not a party to this lawsuit.

12.    Van der Maas used the Chinese name "Dalong Chin" when he lived in Taiwan from 1984 to 2000, so that Chinese speakers could more easily pronounce and remember his name. Van der Maas Decl. ¶ 2, PX 4-1.

---

[4] Plaintiff objects that these declarations are hearsay, but they are admissible as former testimony of an unavailable witness under Federal Rule of Evidence 804(b)(1), and under Federal Rule of Civil Procedure 32(a)(4)(B), which allows use of deposition testimony of any witness who is more than 100 miles away from the place of hearing or trial. Van der Maas was unavailable because he was absent from the hearing and resides in the Mariana Islands, outside the Court's subpoena power and more than 100 miles from Chicago. *See* Fed. R. Evid. 804(a)(5); Fed. R. Civ. P. 32(a)(4)(B). The declaration is admissible as deposition testimony because Van der Maas adopted the declaration as part of his deposition testimony. Van der Maas Dep. 13–14, PX 4. Defense counsel complain that they did not have access to the declaration before the deposition, but that did not deny them the opportunity to examine the declaration at the deposition and cross-examine Van der Maas on its substance. They simply chose not to do so.

13.     Van der Maas created the e-mail account dalong_chin@yahoo.com on November 29, 2000. Van der Maas Decl. ¶ 2, PX 4-1; Yahoo! Account Management Tool, Attach. to PX 11.

14.     Around 2006, Van der Maas provided Smit access to the account. He granted unrestricted access and use of the account to Smit and has never given the account's password to any other person. Since giving Smit the password, Van der Maas has accessed the account "a handful of times" but has not used it to send e-mails. Van der Maas Decl. ¶ 3, PX 4-1.

15.     From October 2008 through June 2, 2010, the Dalong Chin account was accessed 748 times from Smit's home and office. McKenney Decl. p. 3 Chart, PX 10 (summarizing Yahoo! and internet service provider records contained in PX 11–16). Over this same time period, other computers accessed the account a handful of times, including computers located in Guam or another of the Mariana Islands; the Netherlands; and Yahoo!'s offices. T. 72–78 (discussing PX 11–12).

**D.      The Role of the Dalong Chin E-Mail Account in Hiding Illegal Activity**

16.     When using the account, Smit hid his identity by signing messages as "Dalong" or "Dalong Chin," the "general manager" of Asia Pacific. Att. to PX 5; PX 7-5–7-7;[5] T. 49–50 (stipulating that Smit sent these e-mails).

---

[5] These e-mails were admitted as "Group Exhibit 5" and "Group Exhibit 7" at the hearing.

17.     Smit used the Dalong Chin account to hide his identity and those of his customers when engaged in questionable or illegal telemarketing.  As Smit related to one business associate, David Tabb,  "Anything that is FTC compliant you can do with [SBN] direct.  If you are not sure if you are safe, you can deal with Dalong Chin (Dalong_chin@yahoo.com . . . )." E-mail of Mar. 16, 2010, PX 2-28.  At the hearing, Smit admitted that he meant Tabb should use SBN, Smit's American company, for business compliant with FTC regulations, and should deal through Asia Pacific for non-FTC compliant business.  T. 104–05.

18.     Smit explained the role of "Dalong Chin" in instant messaging conversations with another business associate, Doug Kaplan, who was a reseller of SBN's autodialing services.  T. 93.  Smit related, "[W]e do everything that is legal . . . Dalong does the rest."  Smit and Kaplan Chat Log 1087, PX 8-2.  In Smit's own words, "Dalong only cares about money, and what the customers do on the dialer is their own problem." *Id.* at 1005.  Smit also told Kaplan that "we [SBN] never get any lawsuits . . . because we don't break the law" while "Dalong does not get lawsuits, because he has a shredder."  *Id.* at 1096.  He provided Kaplan with  dalong_chin@yahoo.com as "Dalong's" contact information. *Id.* at 1119.  According to Kaplan, "[Smit] wanted the dirty business.  He wanted it as bad as could be."  Kaplan Dep. 112, PX 8.

19.     In the same instant messaging conversations, Smit expressed concern that the FTC and state law enforcement officials might catch up with Asia Pacific.  In August 2009, he told Kaplan that he had received a subpoena from Colorado's Attorney General

"with the hong kong name AND my name on it." Smit and Kaplan Chat Log 966, PX 8-2. He expressed concern that whoever talked to Colorado's Attorney General would also talk to the FTC, because the FTC had "been searching for asia pacific for a couple of month[s]." *Id.* Smit later warned Kaplan, "[I]f I get FTC questions I won't be able to protect you." *Id.* at 1119.

20. Fereidoun Khalilian operated an automobile warranty business that relied almost entirely upon leads and telephone calls initiated by Smit. As a result of new FTC regulations on robocalling that went into effect on or about September 1, 2009, Smit instructed Khalilian to do business through Asia Pacific and to wire funds to an Asia Pacific account in Hong Kong. Smit instructed him to address customer service questions to an individual named Dalong Chin at dalong_chin@yahoo.com. Khalilian and other representatives of his auto warranty business corresponded extensively with "Dalong Chin" at this address. Smit later acknowledged to Khalilian in January or February 2010 that Smit controlled Asia Pacific and that he was Dalong Chin. Khalilian Decl. ¶¶ 2, 6, 14–17, PX 7-1.[6]

---

[6] Defendants object that the Khalilian Declaration is hearsay, but it is admissible on the same grounds explained footnote 4. Khalilian's deposition testimony is admissible because he resides in Orlando, Florida, more than 100 miles away from Chicago and outside the Court's subpoena power. Khalilian adopted the declaration as part of his deposition testimony, at which Defendants' counsel were present and cross-examined Khalilian. Khalilian Dep. 7–8, 20.

21.    Several e-mails admitted into evidence corroborate Khalilian's statement that Smit supplied his customers with leads. Although Smit described SBN as merely a service provider that made its technology available to telemarketers, T. 90, messages sent from the Dalong Chin account show that Smit actively provided clients with telephone numbers to dial. For example, one e-mail sent by Smit promised, "[W]e are working on getting a 'current' whitepage file, at which point you can dial 70 million landlines . . . and a lot more should you decide to go after cellphones." E-mail of Oct. 26, 2009, PX 7-5 at 2. Another stated, "I loaded a half million CST leads in your CST project. This is from a new source." E-mail of Oct. 19, 2009, PX 7-5 at 6. Messages like these could identify Smit as the provider of call lists that contained telephone numbers on the National Do Not Call Registry.

22.    On questioning by the Court, Smit admitted that he used the Dalong Chin account and Asia Pacific as a safe haven for doing business with people who were concerned that they might be violating the law. T. 134. Smit dealt with individual accounts and several resellers such as Doug Kaplan, who had hundreds of accounts. T. 135.

23.    Smit also relied on the Dalong Chin e-mail account to field consumer complaints about telemarketing calls. He used the account to register telephone numbers that originated telemarketing calls, "to shield SBN from consumer activists and crusaders." Smit Dep. 33–34, PX 2. Smit estimated that the account received between five and twenty e-mails per week, consisting mostly of "hate mail" complaining about telemarketing calls. *Id.* at 27–28. He or others at SBN replied to these complaints.

*Id.*

**E. Deletion of the Dalong Chin E-Mail Account Following Entry of the TRO**

24. Smit received notice of this lawsuit and the TRO on June 2, 2010, when the FTC completed service of process and the Receiver interviewed him at his residence. Brick Kane interviewed Smit on behalf of the Receiver. He estimated that he remained at Smit's house until between 2:00 and 3:00 p.m. During the interview, Smit misrepresented his knowledge of Asia Pacific. He told Kane that he knew Asia Pacific was a Hong Kong telecommunications provider, but that he knew nothing more about the company. When the Receiver later reviewed files that it had copied from Smit's computer, however, it found that an Asia Pacific logo; Asia Pacific contracts; and an electronic signature of Dalong Chin in Chinese had been stored on the computer. T. 82–85. The Court finds Kane to be a credible witness.

25. Smit acknowledges that the Receiver remained at his house until about 3:00 in the afternoon on June 2, 2010. T. 112.

26. In a January 2011 affidavit, Smit denied accessing the Dalong Chin account after he received notice of the lawsuit and TRO. Smit Decl. ¶ 8, PX 3. This statement is false. Yahoo! and internet service provider records show that a computer at Smit's residence accessed the account at 3:26 p.m. Pacific Daylight Time (22:26 GMT) on June 2, 2010, shortly after Smit's interview with the Receiver. PX 13, 17. Smit's wife and children were not home at the time. T. 122. Smit stated that one of his computers may have automatically logged in to the account when it was powered on, T. 113, but

the Court rejects this explanation as implausible.

27. Smit testified that the account contained at most thirty messages in its inbox the last time he accessed it. According to Smit, he deleted messages from the inbox once he had resolved whatever issues they raised, and it was his practice to keep no more than one page of messages in the inbox. Smit did not testify about whether any messages existed in sent-mail or trash folders. T. 128–29, 136.

28. Van der Maas received notice of the FTC's lawsuit against Smit in the first week of June 2010. Since receiving notice of the lawsuit, Van der Maas states that he has not logged in to the account, provided anyone with the account password, or authorized anyone to deactivate the account. Van der Maas Decl. ¶ 4, PX 4-2.

29. On June 14, the Receiver e-mailed Smit and requested access to the Dalong Chin account. PX 18-A.

30. The next day, on June 15, a user of the Dalong Chin account deactivated it with Yahoo!'s online deactivation tool. Deactivating a Yahoo! e-mail account requires the user to enter the account password. After a user deactivates an account using the online process, Yahoo! preserves the account's content and permits the user to reactivate the account for only ninety days. Farmanian Decl. ¶ 2, PX 20.

31.     According to records provided by Yahoo!, five international IP addresses logged in to the account in the two days before its deletion, none of which had previously accessed the account. On June 14, the account was accessed by two IP addresses in Germany and one in England, and on June 15, IP addresses from Sweden and South Korea logged in to the account. T. 54–55; McKenney Decl. p. 4 Chart, PX 10 (summarizing Yahoo! business records in PX 17).

32.     Smit denies deactivating the Dalong Chin account or directing anyone else to do so. T. 129. He testified that he neither visited any of the above five locations nor accessed the Dalong Chin account from them on June 14 or 15 of 2010. T. 129–31.

33.     FTC investigator Douglas McKenney explained methods that can be used to hide the identity of a computer accessing the Internet. IP addresses correspond to the geographic location of an Internet connection, but Internet users can hide the IP addresses of their computers if they route their online activity through intermediary computers. T. 56–60.

34.     According to McKenney, all of the five IP addresses that accessed the Dalong Chin account in its final two days were likely associated with the "Tor Project," a collaboration of Internet users seeking to enable online anonymity.[7] In a nutshell, the Tor Project functions by rerouting a user's online activity through an international

_____

[7] Because McKenney's testimony about the Tor Project consisted primarily of hearsay, the Court cites this portion of his testimony merely for an example of how technology can be used to mask IP addresses.

network of servers, allowing the user to reach an online destination through one of many "exit nodes." The user's destination site then records the exit node's IP address rather than the user's true IP address, making it very difficult to trace the user's true identity. The Tor Project does not disclose the IP addresses of its exit nodes, but Google searches performed by McKenney revealed that all five IP addresses that visited the Dalong Chin account in the two days before its deactivation were suspected Tor Project exit nodes. Three of the IP addresses were listed on proxy.org as suspected Tor Project exit nodes, and two were discussed as suspected exit nodes in online forum discussions. T. 60–63; 69–71. The Court finds McKenney to be a credible witness.

35. On July 22, 2010, Yahoo! internally deactivated the Dalong Chin account to prevent the user from regaining access to the account. Internal deactivation would normally have had the same effect as online deactivation, had the June 15 deactivation not already occurred. Yahoo! took this action in response to the Receiver's request to freeze the account. Farmanian Decl. ¶ 3, PX 20. The Receiver would not have made this request had Smit granted it access to the account in June.

36. The FTC sought discovery of documents contained in the Dalong Chin account, but Defendants responded on July 15, 2010 that their access to the account had been "blocked." Defs.' Objections and Resp. 5, PX 23. Nevertheless, Smit testified at his deposition in August that to his knowledge, his access to the account had not been blocked. Smit Dep. 29, PX 2. Smit later submitted another declaration that claimed,

"On September 20, 2010, I attempted to access the 'dalong_chin@yahoo.com' e-mail account to respond to the Federal Trade Commission's discovery request and was denied access." Smit Decl. ¶ 8, PX 3.

37. Meanwhile, the FTC obtained a court order on December 16, 2010 that directed Yahoo! to release the contents of the Dalong Chin account. PX 21. Yahoo! provided certain data about the account but none of its contents, stating that the company had "no further documents responsive to the request in the court order." Letter of Dec. 27, 2010, PX 22. In other words, the FTC was too late, and the account's contents were permanently lost.

**F. Smit Caused the Dalong Chin E-mail Account to Be Deleted.**

38. The Court finds that Smit's testimony lacked credibility on the crucial issues before the Court. Smit has demonstrated a pattern of deceitful conduct throughout this case, in a desperate attempt to hide unfavorable evidence and distance himself from Asia Pacific's questionable dealings. Yahoo!'s records belie Smit's claim not to have accessed the account after receiving notice of the lawsuit and TRO, and the Court finds incredible Smit's explanation that his computer automatically accessed the account on its own when it was powered on. Smit also attempted to mislead the Receiver when he told Kane that he did not know anything about Asia Pacific, other than it was a Hong Kong telecom provider.

39. Most tellingly, Smit was badly impeached about his previous attempts to pass off "Dalong Chin" as a real person. Smit at one point swore in a declaration, "Dalong

Chin permitted me access to his dalong_chin@yahoo.com e-mail account . . . ." Smit Decl. ¶ 85, PX 1.  At the hearing, Smit attempted to account for the statement by explaining that he had merely been referring to Van der Maas by his assumed Chinese name.  T. 107–09.  But Smit only succeeded in demonstrating the old saying that no man has a good enough memory to make a successful liar, as the FTC confronted Smit with deposition testimony that undercut his explanation.  In his deposition, Smit stated that he had spoken to Dalong Chin over the telephone but never met him in person, describing Dalong Chin as a man of unknown nationality who spoke some English but "with a heavy, heavy Chinese undertone."  Smit Dep. 17–18, PX 2.  Smit also claimed at the deposition to have no other business dealings with Dalong Chin, and when asked if Dalong Chin went by any other names, Smit replied that he did not know.  *Id.* at 18.  These statements were completely inconsistent with a description of Van der Maas, because Smit has known Van der Maas for over twenty years; has had many business dealing with him; and knows his nationality and where he lives.  T. 109–12.

40.    Smit's demeanor at the hearing also hurt his credibility.  When faced with difficult questions, Smit turned beet red and on several occasions took long pauses before responding.

41.    The Court finds by clear and convincing evidence that Smit, acting on behalf of SBN and himself, intentionally and in bad faith deactivated the Dalong Chin e-mail account for the purpose of destroying evidence which would have revealed Smit's

involvement in illegal activity. He either deleted the account himself or instructed another person to delete it. Although the record lacks direct evidence that Smit deleted the account, the circumstantial evidence is damning. Smit admitted using the account to shield himself from potentially illegal activities. To paraphrase Smit, "Dalong" avoided lawsuits because he had a shredder. Smit and Kaplan Chat Log 1096, PX 8-2. Smit could not shred the Dalong Chin e-mail account, but he could deactivate it. In fact, the account was deactivated only a day after the Receiver sent Smit an e-mail requesting access to the account. Given his motive and opportunity, the sequence of events strongly and clearly demonstrates that Smit was behind the account's deletion. And Yahoo!'s log-in records do not help Smit. Five IP addresses from around the world suddenly logged in to the account in the last two days of its existence, none of which had accessed the account in the prior two years for which log-in records exist. The Court finds it implausible that these log-ins were executed by users in locations ranging from Sweden to South Korea. Rather, Smit or his agent used IP masking technology in an attempt to anonymously delete the account. Whether Smit used the precise masking technology described by the FTC is not material. The Court concludes that Smit deleted the Dalong Chin account and attempted to hide that he had done so with full knowledge that he was violating the TRO, and with the intent to avoid disclosing the account's contents to the Receiver or the FTC.

42. The Dalong Chin account contained information relevant to this case. Smit admitted

that he used the account to field consumer complaints and to communicate with those clients who desired to engage in questionable or illegal telemarketing. Since Smit's purpose in using the account was to avoid detection by the FTC and other law enforcement agencies, it is a fair inference that the account contained communications worth hiding. His correspondence with clients could have played an important role in proving Smit's knowledge and level of involvement concerning his clients' telemarketing operations. Although the FTC already has evidence about Smit's communications with a few of his clients, Smit admitted that he had over 300 customers, T. 135, so the account likely contained evidence showing his knowledge of and involvement with additional clients' operations. Smit testified that the account's inbox contained at most thirty messages when this suit was filed, but the Court gives that statement little weight. And even if it were true, those messages likely contained important evidence. Moreover, Smit did not know the extent of the account's sent-mail or trash folders. With the account permanently deactivated and the contents deleted, nobody can say precisely how much relevant evidence the account contained. Smit's decision to deactivate it in the face of a TRO certainly suggests he thought its contents would prove him and SBN liable in this case. In sum, the Court finds by clear and convincing evidence that the FTC's case has been prejudiced by Smit's deletion of the dalong_chin@yahoo.com e-mail account.

## II.  CONCLUSIONS OF LAW

**A.    Bases for Contempt and Spoliation Sanctions**

To succeed on a contempt petition, the FTC must "demonstrate by clear and convincing evidence that the respondent has violated the express and unequivocal command of a court order." *FTC v. Trudeau*, 579 F.3d 754, 763 (7th Cir. 2009) (citation omitted). To sustain a contempt finding, the FTC has the burden of proving the following four elements by clear and convincing evidence: (1) the order sets forth an unambiguous command; (2) the respondent violated that command; (3) the respondent's violation was significant, meaning it did not substantially comply with the order; and (4) the respondent failed to take steps to reasonably and diligently comply with the order. *Prima Tek II, LLC v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008). A court that issues a valid injunctive order always has the authority to deal with defiance of the order through its contempt power. *SEC v. Homa*, 514 F.3d 661, 673–74 (7th Cir. 2008). Civil contempt sanctions, as opposed to criminal contempt sanctions, are "remedial, and for the benefit of the complainant." *Trudeau*, 579 F.3d at 769 (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827–28 (1994)).

Clear and convincing evidence is a high standard of proof. The Supreme Court has defined "clear and convincing" evidence as evidence that places "in the ultimate fact-finder an abiding conviction that the truth of [the movant's] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (citation omitted); *see also Cruzan by Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 285 n.11 (1990) (describing "clear and convincing evidence" as "evidence so clear, direct and weighty and convincing as to enable [the fact-finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue" (citation omitted)). That said, the "clear and convincing" standard does not imply any requirement that the movant must present direct rather than circumstantial evidence. *Maynard v. Nygren*, 372 F.3d 890, 892 (7th Cir. 2004) (affirming finding that a party committed willful misconduct).

Putting contempt to the side, courts may also sanction parties for spoliation of evidence, under their inherent authority or under Rule 37 of the Federal Rules of Civil Procedure. Spoliation of evidence "occurs when one party destroys evidence relevant to an issue in the case." *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002). Rule 37 authorizes sanctions only where a party violates a court order to provide or permit discovery, though courts have interpreted the meaning of "order" broadly. *See Rhodes v. LaSalle Bank, N.A.*, No. 02 C 2059, 2005 WL 281221, at *2 (N.D. Ill. Feb.1, 2005). Courts also have inherent authority to sanction litigants for conduct that abuses the judicial process. *Dotson v. Bravo*, 202 F.R.D. 559, 574 (N.D. Ill. 2001) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991)). A court's inherent power to impose spoliation sanctions arises only if a

party destroyed evidence in bad faith. *See Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008). In the context of destroying evidence, "bad faith" means "destruction for the purpose of hiding adverse information." *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998). Upon determining that discovery sanctions are appropriate, a judge has discretion to impose a sanction "proportionate to the circumstances." *Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009).

Clear and convincing evidence has been the traditional standard required by the Seventh Circuit for ordering a default judgment as a discovery sanction. *JFB Hart Coatings, Inc. v. AM General LLC*, --- F. Supp. 2d ---, 2011 WL 462692, at *5 (N.D. Ill. Feb. 8, 2011) (citing *Maynard v. Nygren*, 332 F.3d 462, 467–68 (7th Cir. 2003)). More recent cases have called into question the elevated standard of proof, but without yet overturning the existing precedent that requires it. *See Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Americas LLC*, 516 F.3d 623, 625–26 (7th Cir. 2008); *Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 564 (7th Cir. 2007). In any case, this Court has made its factual findings by clear and convincing evidence.

## B.     Parties Liable for the Sanctionable Conduct

Defendants do not contest that Smit and SBN should be sanctioned if the Court concludes that Smit deleted the Dalong Chin account, but a question exists about whether sanctions should extend to Repo and Bakker-Smit. Smit is the sole principal of SBN, and he admitted using the Dalong Chin account to shield SBN from potentially illegal business. On the other hand, the FTC did not elicit testimony concerning what role, if any, Repo or

Bakker-Smit played in using or deactivating the Dalong Chin account. Smit is a director of Repo, but without a clearer picture of Smit's control over the company or what role Repo played in the telemarketing activities at issue, the Court will not impute Smit's contempt and spoliation to Repo. Likewise, the FTC did not introduce evidence that Bakker-Smit ever accessed, much less deactivated, the Dalong Chin account. The FTC stresses that Bakker-Smit lives with Smit at the same address where the Dalong Chin account was accessed hundreds of times, but that does not prove that she played a role in deactivating the account. The Court therefore declines to sanction or hold in contempt Repo or Bakker-Smit.

As for Smit and SBN, the Court finds them in contempt of court, and in the alternative, invokes the Court's inherent authority to sanction bad-faith conduct. Smit and SBN acted in contempt when Smit violated the "express and unequivocal command[s]" of the TRO. *Trudeau*, 579 F.3d at 763. After receiving notice of the TRO on June 2 and the Receiver's request for access on June 14, Smit deleted the Dalong Chin account. With that, Smit and SBN violated those portions of the TRO that prohibited them from destroying or erasing documents "that relate in any way to the business practices or business" of Defendants and required them to provide "any information to the Receiver that the Receiver deems necessary" to discharging its responsibilities. TRO at 14, 19, PX 19. The deletion was a brazen ploy to destroy adverse evidence and therefore also falls within the Court's inherent power to sanction litigants for bad-faith conduct. Smit's attempt to anonymously delete the account and his subsequent false testimony underscores his bad faith. Because the Court's contempt power and inherent authority to sanction bad faith both apply here, the

Court need not analyze whether Rule 37 also supports sanctions.

**C.     An Adverse Finding Is the Appropriate Sanction.**

The FTC requests a default judgment as a sanction, or at minimum certain adverse inferences to be drawn against Defendants.  To be sure, Smit's misconduct was on par with behavior that has earned other litigants default judgment or dismissal as a sanction.  *See, e.g.*, *Grochocinski v. Schlossberg*, 402 B.R. 825, 842–43 (N.D. Ill. 2009) (debtor prohibited from opposing trustee's claims as a sanction for destroying electronic files).  That said, the Court concludes that adverse inferences will serve as a more workable sanction here, given the present uncertainty over the appropriate scope of damages or other relief.

To minimize the prejudice to the FTC from Smit's deletion of the Dalong Chin account, the Court orders the following as conclusively established against Smit and SBN:

> Within the meaning of 16 C.F.R. § 310.3(b), Johan Hendrik Smit Duyzentkunst and SBN Peripherals, Inc. provided substantial assistance and support to all sellers or telemarketers who, using the autodialer at issue in this action, made any calls that violated 16 C.F.R. §§ 310.3(a)(2)(iii), (a)(2)(vii), or (a)(4), or 16 C.F.R. § 310.4.  For all such calls, Smit and SBN knew that the sellers or telemarketers were engaged in   acts or practices that violated 16 C.F.R. §§ 310.3(a)(2)(iii), (a)(2)(vii), or (a)(4), or 16 C.F.R. § 310.4.  As a result, Smit and SBN will be subject to "assisting and facilitating" liability for all violations of 16 C.F.R. §§ 310.3(a)(2)(iii), (a)(2)(vii), or (a)(4), or 16 C.F.R. § 310.4 that occurred in calls initiated from the autodialer.

In effect, the FTC can now establish liability merely by proving that Smit's and SBN's clients violated the relevant regulations in calls originated through the autodialer. The regulations listed in the finding are those for which "assisting and facilitating" liability is alleged under Counts Three and Ten. Complaint ¶¶ 59–60, 69–70, Dkt 1.

This finding is an appropriate sanction because it holds Smit and SBN to account for whatever communications the Dalong Chin account contained. It assumes that the communications between Smit and his clients would have shown that Smit and SBN provided substantial assistance and support to all sellers or telemarketers who used the autodialer. And the finding assumes that the client communications plus consumer complaints in the account would have established that Smit and SBN were aware of any illegal telemarketing that occurred through the autodialer. The finding includes adverse conclusions of law rather than merely factual inferences, because Smit's conduct merits a strong sanction. Perhaps the destroyed evidence would not have established "assisting and facilitating" liability as to every violation of the relevant regulations that occurred in autodialer calls, but Smit must now lie in the bed he has made. In short, the sanction forces Smit and SBN to bear the uncertainty created by their intentional destruction of evidence.

The adverse finding also benefits the FTC by facilitating its case against Smit and SBN, and is therefore a properly "remedial" civil contempt sanction. *See Trudeau*, 579 F.3d at 769. Of course, nothing in this opinion shall prevent the FTC from seeking to establish liability by alternative means or from putting on evidence to establish any of the allegations set forth in its complaint.

## IV. CONCLUSION

For the reasons explained above, the FTC's motion for sanctions and for a rule to show cause why Defendants should not be held in contempt of court is granted in part and denied in part. The motion is denied as to Janneke Bakker-Smit Duyzentkunst and Repo B.V. Johan Hendrik Smit Duyzentkunst and SBN Peripherals, Inc. are found in contempt of court and are sanctioned with the adverse finding set forth in this opinion.

SO ORDERED THIS 25th DAY OF MAY, 2011.

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Steven M. Wernikoff
Charles M. Evans
James Davis
Federal Trade Commission
55 West Monroe Street
Suite 1825
Chicago, IL 60603

Counsel for Plaintiff


Gary Owen Caris
Lesley Anne Hawes
Mckenna Long & Aldridge LLP
300 South Grand Avenue
14th Floor
Los Angeles, CA 90071

Ira Bodenstein
Terence G. Banich
Shaw Gussis Fishman Glantz Wolfson &
Towbin LLC
321 N. Clark Street
Suite 800
Chicago, IL 60654

Counsel for the Receiver

Henry T. Kelly
Michael Ryan Dover
Kelley, Drye & Warren
333 West Wacker Drive
Suite 2600
Chicago, IL 60606

Counsel for Defendants